RAND L. STEPHENS, SBN 117229
LAW OFFICES OF RAND L. STEPHENS
1155-C ARNOLD DR. #278
MARTINEZ, CA  94553
(510)232-9335
Facsimile: (510)232-4633
Email: rand@randslaw.com

RICHARD N. KOSS, SBN 251351
570 EL CAMINO REAL STE 150-340
REDWOOD CITY, CA  94063
(650)722-7046
Facsimile: (650)592-3871
E-mail: richard@rkosslaw.com

Attorneys for Plaintiff:
C. ROBERT PETTIT, M.D.

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| C. ROBERT PETTIT, M.D.,<br><br>             Plaintiff,<br><br>     vs.<br><br>CONTRA COSTA MEDICAL SERVICES REGIONAL MEDICAL CENTER and DOES ONE THROUGH TWENTY, Inclusive<br><br>             Defendants | Case No.: C 07 3358 JSW<br><br>**DECLARATION OF C. ROBERT PETTIT, M.D. IN SUPPORT OF PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS MOTION FOR SUMMARY JUDGMENT AND/OR SUMARY ADJUDICATION OF THE ISSUES** |

I, C. ROBERT PETTIT, M.D., hereby declare as follows:

1. I am the Plaintiff in the above caption case and if sworn to testify would testify as follows. I am a medical doctor properly licensed in the state of California and I am board certified as a specialist in the diagnosis and treatment of medical dysfunctions and injuries to the ear, nose and throat of human patients.

DECLARATION OF C. ROBERT PETTIT, M.D.

2. Since 1975 have held an academic appointment at UCSF School of Medicine as Assistant Clinical Professor. Since 2002, I have been a Medical Consultant for the Enforcement Division of the Medical Board of California, a position that requires me to make decisions about what practice behavior constitutes a departure from the standard of care for physicians. From February 1, 2005 through March 3, 2007, I also held a contract position of Ear Nose and Throat (ENT) Specialist for the Contra Costa Regional Health Center (CCRHC).

3. I was hired as an ENT by Defendant, CONTRA COSTA MEDICAL SERVICES REGIONAL MEDICAL CENTER and we entered into a written agreement on February 1,2005. A true and correct copy of that agreement is attached to this declaration as Exhibit 1. The term of the contract ran from February 1, 2005 through January 31, 2008, with a limit of compensation of $1,117,000. The rate of pay included $1,250.00 to be paid to me by Defendant for each 4 hour clinic, $312.50 per hour. I am informed, believe and thereon allege that the contract was approved and accepted by Contra Costa County on or before February 1, 2005. All of my hours were mandated by Dr. Corcoran and the the medical center and I could not and did not determine when I would work. I was assigned nurses by the medical center and I had no input as to which nurses or other staff would be assigned to me. Different nurses worked with me on different shifts, as assigned by the medical center. All of the crediientials and other requirements for my position were determined by the defendant medical center. I was required to remain a member in good standing on the medical center staff as a term of employment.

4. Prior to being offered an employment contract with Defendant, I worked for six months as a temporary, *locums tenen,* through an employment agency. Dr. Corcoran, then ENT Section Chief, approved offering him a three year contract. Prior to my complaints and whistle blowing activities, my working relationship with the CCRHC staff was entirely positive and cordial, including socializing and reciprocal dinners with the medical staff. Prior to my whistle blowing activities, I did not receive any

DECLARATION OF C. ROBERT PETTIT, M.D.

negative feedback from Dr. Corcoran, Dr. Berguer, or Dr. Smith, my immediate supervisors. I never received any written criticism.

5. I was 66 years old at the time of the premature termination of employment with Defendant, on or about March 3, 2007.

6. Defendant CONTRA COSTA MEDICAL SERVICES REGIONAL MEDICAL CENTER is located in Martinez, California. It is an emergency services hospital, class 2. At all times during my contract, Defendant's own policy required all specialist who responded to emergency room requests for consultations to live within 30 minutes from the medical facility. ENT who fit that requirement at CCRHC other than Plaintiff are: 1) Dr. Martha Corcoran, ENT Section Chief, who works at CCRHC part-time and takes emergency calls from her home in Davis; and 2) Dr. William Keating, who is full time and takes emergency calls from his home in Point Richmond. The ENT surgery specialists report to Dr. Berguer, Chief of Surgery, who takes emergency calls from his home in Novato. Davis, Point Richmond, and Novato are each more than thirty minutes from the hospital in Martinez.

7. I became generally aware that the standard of care was repeatedly being compromised because of the distance that on-call doctors live from the facility, in excess of the thirty minute response time required by Defendant. I was driven to action by the severity of three incidents that occurred on August 29, 2006, when Dr. Keating, the ENT doctor on emergency call, did not leave his Point Richmond home and drive to Martinez to see three ENT emergency patients who presented to the emergency room that night, all having potentially life-threatening problems. Dr. Keating also did not come to the hospital to see the patients the next morning, and he then left for vacation in the afternoon without notifying me or any of the ENT doctors on call, about the patients. As a result, one patient with a nose-bleed bled to the point of anemia that required hospitalization, and she had painful packing placed in both nostrils by non-specialists. The second patient had a peritonsillar abscess, a painful collection of pus behind the tonsil, which caused swelling in his throat that was severe enough to cause symptoms of airway obstruction and swallowing difficulty and required admission to

DECLARATION OF C. ROBERT PETTIT, M.D.

the intensive care unit and could have required immediate draining, or even emergency tracheostomy due to the threat to the airway. The third patient, a diabetic, did not receive ENT evaluation of a severe facial infection that required immediate judgment about treatment, and possible incision and draining. Dr. Keating was called repeatedly by the emergency room doctor and did not come to the hospital to see the patients.

8. Because these were not the first such incidents, I sent an email to Dr. Corcoran on or about September 5, 2006 notifying her of these dangerous incidents of substandard care. A true and correct copy of that email is attached as Exhibit 2. When I did not receive an effective response about these life-threatening issues, I brought up the care issue at an ENT section meeting on or about September 20, 2006. A true and correct copy of the minutes prepared of that meeting, showing the issue was discussed, is attached as Exhibit 3. This resulted in Dr. Keating refusing to change his behavior and threatening me with "warfare" during the meeting, saying: "live by the sword, die by the sword".

9. After that meeting, Dr. Keating began writing inflammatory emails to Plaintiff questioning his management of patients, and sending copies to Dr. Corcoran and Dr. Berguer. Dr. Berguer then called Dr. Pettit into his office and verbally threatened to fire Dr. Pettit for his "style of practice" and "inability to get along with Dr. Keating;" and he falsely stated that I was not carrying his weight within the ENT section.  In fact I was handling more emergency treatments, conducting more surgeries and seeing a bigger case load of patients then most, if not all, ENT doctors on staff.

10. I became alarmed by the obvious retaliatory actions by Dr. Keating and Dr. Berguer over my whistle blowing activities and after this meeting with Dr. Berguer, I

DECLARATION OF C. ROBERT PETTIT, M.D.

submitted a formal, written complaint to him dated November 29, 2006, documenting the three incidents of August 29, 2006 and stating that the medical center policies, the failure to enforce the policies and the sub-standard practices were contributing to patient/public endangerment and to a deviation from standard of care.  My letter also included a list of all ENT surgical procedures performed in the past year, showing that I had performed more surgical procedures than Corcoran and Keating combined, and seen more clinic patients. Subsequently I presented the same letter to Dr. Jeffrey Smith, Chief of Staff on or before December 1, 2006. A true and correct copy of that letter is attached as Exhibit 4.

11. In my capacity as a consultant with the Medical Board for the State of California, it is my job to evaluate complaints against ENT doctors practicing in the state and to determine and opine as to whether or not an individual's medical care is above or below the standard of care. Despite my vast experience and position with the Enforcement Division of the Medical Board of California, no credibility was given to my valid complaints and instead, I was retaliated against by the management. The medical center ratified and condoned management's conduct and elected to terminate my contract and did not investigate or respond in any way to my complaints. No disciplinary action was taken against Dr. Keating, and Defendant made no effort to remedy the problem brought to bear and to improve medical care. In fact, Dr. Jeff Smith, an Administrator and Assistant Chief of Staff for Defendant, falsely stated to a Department of Public Safety Inspector, who was investigating Plaintiff's complaints, that CCRHC had "no problems" concerning emergency on-call response, and when

DECLARATION OF C. ROBERT PETTIT, M.D.

asked specifically if any doctors lived outside the 30 minute limit, Dr. Smith said "no," thus materially interfering with a Department of Public Safety investigation.

12. I was allegedly terminated on March 3, 2007 by a letter allegedly dated January 3, 2007, which I received on or about January 29, 2007. I was only paid through March 3, 2007, not withstanding the fact the medical center alleges I was terminated March 23, 2007.

13. The medical center has now further concealed the safety issue by changing the policy to accommodate the medical staffs' inability to respond to the hospital within the 30 minute limit. As a result, the danger to the public has continued unabated. For example, a 54-year-old man, who had undergone a tracheostomy two days previously by Dr. Keating, unnecessarily bled to death on the ward while the on-call ENT doctor stayed at his distant home. Another patient was seen in the emergency room on or about January 27, 2007 because of pain, swelling, and dysphasia that had been worsening over several days. The patient was sent home after a telephone consultation with Dr. Keating, the ENT doctor on call. Several days later, still having throat pain, Dr. Pettit saw the patient routinely in the out-patient clinic, and he removed a large, imbedded fishbone from the tongue base that had caused the symptoms.

DECLARATION OF C. ROBERT PETTIT, M.D.

1  I declare under penalty of perjury under the laws of the United States and California that
2  the foregoing is true and correct and this declaration was executed at _Los Angeles,_
3  California on the date set forth below.

4
5  Dated: August 4, 2008

6
7                                          _____
8                                           C. ROBERT PETTIT, M.D.

DECLARATION OF DR. C. ROBERT PETTIT IN SUPPORT OF PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT'S FOR SUMMARY JUDGMENT OR PARTIAL SUMMARY JUDGMENT
Pettit v. Contra Costa Medical Services Regional Medical Center          Case No. C 07 3358 JSW